[845 NYS2d 227]

In the Matter of HAROLD MEYERSON, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, October 25, 2007

**APPEARANCES OF COUNSEL**

*Thomas J. Cahill, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Jorge Dopico* of counsel), for petitioner.

*Richard M. Maltz* for respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent Harold Meyerson was admitted to the practice of law in the State of New York by the Second Judicial Department on June 17, 1970. At all times relevant to these proceedings, respondent maintained an office for the practice of law within the First Judicial Department.

On January 27, 2004, respondent pleaded guilty to one court of employing an individual to illegally solicit clients in violation of Judiciary Law § 482, an unclassified misdemeanor, and was sentenced to an unconditional discharge. By unpublished order entered September 22, 2006, we determined this was a "serious crime" and referred the matter to the Disciplinary Committee for a sanction recommendation hearing.

The Hearing Panel conducted proceedings on January, 19, 2007, at which time respondent testified on his own behalf as to the circumstances that lead to his conviction. He also submitted 13 letters attesting to his good character. By report dated April 26, 2007, the Hearing Panel recommended censure.

The Committee seeks an order, pursuant to 22 NYCRR 603.4 (d) and 605.15 (e), confirming the findings of fact, conclusions of law and recommendation of censure set forth in the Hearing Panel's determination.

The undisputed facts reveal that respondent's misconduct occurred during a five-month period of time in the early part of 2003. During that time, his solo practice consisted of a high volume of personal injury matters, matrimonial and criminal defense cases, and general business litigation. Respondent admitted during his plea allocution that he paid Emil Izrailov a sum of money for referring clients to him who had been involved in motor vehicle accidents and who were receiving treatment from I.K. Medical, P.C., a clinic run by Izrailov. In his testimony before the Hearing Panel, respondent testified that he had agreed to pay Izrailov's clinic $800 for a narrative medical report of any patient referred to him by the clinic whom he accepted as a client. These reports were prepared by a physician and described the client's injuries, related those injuries to the accident, and set forth the course of treatment and prognosis. Respondent testified that providing these reports to the insurance carrier in the early stages of the settlement negotiation process usually resulted in early and favorable results for his clients. He

also stated that if he referred any client to the clinic, there would be no charge for the narrative report.

Between February and June 2003, respondent paid for approximately 11 narrative reports and referred two clients to the clinic who were not charged when he ordered their narrative reports. Two of the 11 clients for whom respondent purchased narrative reports did not continue treatment with Izrailov and decided against pursuing lawsuits. Izrailov refunded the cost of those reports.

Respondent denied paying Izrailov and money other than for the cost of the reports and believed that it would be necessary to purchase these reports at some point in the litigation in order to pursue settlement negotiations on behalf of his clients. While acknowledging that this type of arrangement could be viewed as an improper quid pro quo, he did not appreciate that fact at the time. In fact, he believed it was beneficial to his existing clients because they would receive free narrative reports if he referred them for treatment to one of Izrailov's clinics. During the 5 month period in question, respondent estimated that he was retained by approximately 30 patients referred by Izrailov. He resigned from these cases after his arrest to avoid what he believed to be a potential conflict of interest.

The Hearing Panel examined the allegations made in the felony complaint to ascertain whether respondent's conduct was more egregious than that to which he admitted in his plea allocution. The Committee did not offer any evidence to suggest that respondent was a participant in the broader conspiracy alleged in the felony complaint, i.e., conspiracy to commit insurance fraud. Respondent submitted third-party evidence demonstrating that he was not willing to be a party to an effort to inflate or submit false claims to no-fault insurers. The Panel concluded that respondent came to the attention of the Attorney General's Office (OAG) solely as a result of its targeting and wiretapping of Izrailov and his coconspirators and that the Attorney General's agreement to dismiss the complaint in return for a misdemeanor plea and a sentence of unconditional discharge was "strong circumstantial evidence that the OAG lacked sufficient evidence to prove that Respondent was a member of the charged conspiracy."

After reviewing recent precedents involving improper solicitation or illegal payment for the referral of clients, the Panel noted that either censure or a short suspension was imposed in those cases. Applying those precedents to this case, the Panel

noted that, unlike those situations where attorneys paid money to the solicitor for each client referred, respondent agreed to purchase a narrative report in exchange for each referral that resulted in his retention. The Panel went on to note that the "evidence is compelling that the clients needed these reports in order [to] pursue their claims and would, in any event, have had to purchase them from another provider, if not Izrailov." Significantly, the Panel found that the $800 paid for each report was "the market price for such reports at the time." Noting the "unusual aspects" of this arrangement, including the fact that these reports would be provided free of charge if an existing client sought treatment from Izrailov's clinic, thus benefitting the client, the Panel found respondent's arrangement to be qualitatively different from the classic solicitation scenario. Taking into account the fact that respondent vigorously vetted the bona fides of each potential client's claims before accepting the case, his monitoring of his clients' medical treatment to guard against improper billing, his unblemished 37-year legal career which included public service, his prompt reporting of his conviction, full cooperation, absence of complaints from clients and sincere remorse, as well as letters from attorneys who had referred clients to respondent and stated they would do so again once the proceedings had concluded, as well as the severe financial loss to respondent who closed his law office as a result of these proceedings, the Panel recommended censure as an appropriate sanction in this case.

The findings of fact and conclusions of law regarding respondent's misconduct should be confirmed as they were fully supported by the record and admitted to by respondent.

While the respondent, a 61-year-old experienced attorney should have known that his arrangement with the clinic for client referrals under the apparent guise of paying for narrative reports was unethical and illegal, he expressed genuine remorse for his misconduct and testified that he has essentially stopped practicing law until the conclusion of these proceedings. Moreover, this matter is distinguishable from *Matter of Ehrlich* (252 AD2d 73 [1998]), where the attorney paid a hospital employee to solicit clients for him by handing out Ehrlich's business card to patients. The respondent in *Ehrlich* obtained 30 clients over a two-year period as a result of this arrangement and terminated the scheme because of the "low monetary value of the cases" (*id.* at 74). In confirming the recommendations of a three-month suspension, we noted that Ehrlich only ended his scheme

because it was unprofitable, only began cooperating after being caught, and nearly three dozen instances of solicitation were involved during the two-year period.

In *Matter of Setareh* (264 AD2d 146 [2000]) and *Matter of Hankin* (296 AD2d 238 [2002]), both decided after *Ehrlich,* we noted the significance of the number of ethical misdeeds involved as a factor in determining the severity of the sanction. In *Setareh,* the attorney received a public censure for agreeing to pay an undercover informant who had approached him for two client referrals. In *Hankin,* the attorney also received a censure for paying a fee to a third party for referring one personal injury client and was convicted of criminal solicitation in the fifth degree.

Here, respondent testified that he did not think he was harming his clients by paying for the narrative reports that he ultimately needed in order to settle their claims expeditiously, and the Hearing Panel found he had provided truthful testimony. There are no aggravating factors in this case and the factors in mitigation, as discussed above, reflect an attorney who committed an uncharacteristic mistake for which he has taken full responsibility and for which he has demonstrated remorse. While respondent's arrangement was certainly improper, the Hearing Panel found that his quid pro quo arrangement was "qualitatively less pernicious than the classic cash-for-client solicitations depicted in *Ehrlich, Setareh, Hankin* and *Santalone.*"

Accordingly, the Committee's petition should be granted, the Hearing Panel's findings of fact and conclusions of law confirmed, and respondent publicly censured.

MARLOW, J.P., BUCKLEY, SWEENY, McGUIRE and MALONE, JJ., concur.

Respondent publicly censured.