[919 NYS2d 141]

In the Matter of ALEXIS RAVITCH (Admitted as ALEXANDRA S. RADUSHKEVICH), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, March 8, 2011

## APPEARANCES OF COUNSEL

*Jorge Dopico, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Stephen P. McGoldrick* of counsel), for petitioner.

*Michael S. Ross*, for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Alexis Ravitch was admitted to the practice of law in the State of New York by the Second Judicial Department on March 15, 1995 under the name Alexandra S. Radushkevich. At all times relevant to this proceeding, she maintained an office for the practice of law within the First Judicial Department.

On February 28, 2005, respondent pleaded guilty to soliciting business on behalf of an attorney in violation of Judiciary Law § 479, an unclassified misdemeanor, and was sentenced to a conditional discharge. This conviction arose out of a sting operation targeting a medical clinic called the Medical Arts Center, in Queens County, whose manager, Arthur Bogoraz, ultimately pleaded guilty to enterprise corruption based on an insurance fraud scheme. The incident that led to respondent's guilty plea occurred when a staff member at the medical clinic telephoned respondent and informed her that the clinic had a patient who had sustained potentially serious injuries, but who had declined the clinic staffer's suggested referral to respondent. Respondent then instructed her paralegal to seek out and persuade that patient to retain her law firm. The purported patient was actually an undercover officer, and respondent was charged with violations of Judiciary Law §§ 479 and 482, resulting in her plea of guilty to the charge under section 479.

Respondent reported the conviction to the Departmental Disciplinary Committee, and the Committee sought and obtained an order of this Court deeming the conviction a "serious crime" within the meaning of Judiciary Law § 90 (4) (d), and referring the matter for a hearing on the appropriate sanction. After the hearing, the Hearing Panel issued its report recommending that respondent be publicly censured; one member of the Panel dissented and recommended disbarment.

The Committee now moves pursuant to 22 NYCRR 603.4 (d) and 605.15 (e) (2), for an order disaffirming in part the determination of the Hearing Panel and suspending respondent from the practice of law for a period of no less than 18 months. Respondent opposes the motion and cross-moves for an order affirming the Panel's report and imposing a public censure.

It is the Committee's position that respondent's professional misconduct extends beyond the undisputed act of client solicitation for which she was prosecuted. Relying in part on the testimony of Arthur Bogoraz, and the views of the dissenting

member of the Hearing Panel, the Committee asserts that "in all likelihood" respondent engaged in other acts of improper solicitation of clients. It further contends that an important factor in aggravation is respondent's admission that on a number of occasions she simultaneously represented the driver and passenger of automobiles in personal injury matters, in violation of the then-governing Code of Professional Responsibility DR 5-105 (22 NYCRR 1200.24), and the ruling in *Pessoni v Rabkin* (220 AD2d 732 [1995]).

Initially, notwithstanding the Committee's, and the dissenting Panel member's, asserted belief that respondent must have engaged in other acts of client solicitation, the credible evidence fails to justify such a finding that respondent engaged in other acts of client solicitation beyond that for which she was prosecuted. Before this Court may impose penalties for attorney misconduct, that misconduct must be established by evidence, not merely by belief.

What the testimony of both respondent and Arthur Bogoraz does establish is that respondent engaged in a practice that has repeatedly been described to this Court as standard among personal injury attorneys who accept referrals of patients from medical clinics; that is, they pay a substantial, standard sum to these clinics for each patient referred to them, ostensibly to pay for the clinic's providing a package of documents called a narrative report, relating the patient's diagnosis, treatment, and prognosis (*see Matter of Rudgayzer*, 80 AD3d 151 [2010]; *Matter of Meyerson*, 46 AD3d 141 [2007]). Even though it is permissible for attorneys to accept clients referred by medical establishments, and it is similarly permissible for attorneys to pay medical providers the market price for copies of documents needed to prosecute claims on behalf of those clients, both *Rudgayzer* and *Meyerson* illustrate the potential for impropriety inherent in this established system, by which clinics refer patients to attorneys, and receive, in turn, a payment from the attorney for the clinic's narrative reports on those patients.

In *Meyerson*, in which this Court imposed a public censure, the respondent attorney originally pleaded guilty to employing an individual to illegally solicit clients in violation of Judiciary Law § 482, based on his paying the owner of a medical clinic for patient referrals. Before the Hearing Panel, the respondent testified that he had agreed to pay the clinic $800 for the narrative medical report of any patient the clinic referred to him whom he accepted as a client, and during a five-month period in

2003, paid for approximately 11 narrative reports. Notably, when two of the referred patients decided against pursuing lawsuits, the clinic owner refunded the cost of those reports, and when the respondent referred two of his clients to the clinic for treatment, the clinic did not charge for their narrative reports. The latter particulars justified this Court's characterization of the respondent's arrangement with the clinic as a "quid pro quo arrangement" and the remark that "his arrangement with the clinic for client referrals under the apparent guise of paying for narrative reports was unethical and illegal" (46 AD3d at 144). Parenthetically, in *Meyerson*, as in the matter now before us, the respondent was not shown to have been a party to the clinic's criminal insurance fraud enterprise; he did not participate in submitting inflated or false claims to insurers.

Notably, this Court's reasoning in *Meyerson* did not hold it to be unethical and illegal for an attorney to accept client referrals and to pay market rates for narrative reports. Rather, it was the nature of the prior agreement with the clinic's owner, creating a "quid pro quo arrangement" (*id.* at 145), that warranted the imposition of attorney discipline.

In *Rudgayzer*, the respondent pleaded guilty to a violation of Penal Law § 175.30, based on his filing a closing statement "indicating that his firm paid $500 for a medical narrative in a client matter when the payment was 'also an inducement paid to [the clinic] to refer additional accident vehicle clients to [him]' and constituted 'something of value for the solicitation of clients.' " (80 AD3d at 152.) The evidence presented to the Hearing Panel in *Rudgayzer* further indicated that the respondent accepted a total of approximately 150 referrals from three medical clinics, purchasing narrative medical report packages in each of those cases for a fee of $500 to $1000, and that in addition, he had agreed to represent some 10 to 15 clients that he did not want to represent, paying for narrative reports in each matter, "in order to keep referrals flowing." (*Id.* at 153.) In imposing a two-month suspension, this Court's opinion emphasized the respondent's own recognition that accepting those 10 to 15 cases that he would have preferred not to handle was "akin to a bribe" and thus constituted solicitation. The opinion goes on to remark that payments of the market price for the clinics' narrative reports in those 10 to 15 cases that the respondent did not want was "less egregious" than the cash payments paid to a hospital employee for client referrals in *Matter of Ehrlich* (252 AD2d 73 [1998]), "since the 'market price' was

paid for the narratives, those documents are useful in prosecuting soft-tissue motor vehicle accident claims, and they represent work actually performed by the clinics in preparing the reports." (80 AD3d at 155.) By focusing on only those 10 to 15 cases, this Court implicitly concluded that there was nothing improper in the respondent's acceptance of the referrals and his paying for narrative reports in the remaining 150 cases.

In the matter now before us, the Committee suggests that the testimony of Arthur Bogoraz establishes that in addition to the one undisputed act of misconduct, respondent here did more than merely accept the clinic's referrals and pay for narrative reports. Indeed, Bogoraz did testify that it was his practice to have clinic staff fax police reports of accidents to a list of seven or eight attorneys, including respondent, and see which of the attorneys "bid" more for the "right of first refusal" to these cases. He indicated that the amount respondent would pay for such a right of first refusal "went up from $700 to $800," although if the insurance company wasn't "good," the fee might be only $400. He also said that he believed cash payments were sometimes made. However, neither Bogoraz nor the Committee provided documentation supporting his claim that the clinic accepted the highest bid from lawyers for each case; in fact, the documents presented, including checks that were all in the same range of amounts, indicated to the contrary. Bogoraz also directly contradicted himself, testifying that respondent "paid what every other lawyer paid to basically every other clinic." While the Committee referred in its motion papers to extensive evidence of surreptitious payments by respondent to Bogoraz, the only evidence of *any* surreptitious payments by respondent was Bogoraz's vague, contradictory, and entirely unsupported testimony.

Given Bogoraz's outright contradictions and his purported failures of memory, our own independent reading of the hearing transcript and review of the evidence, as well as the deference we ordinarily give to the credibility finding of the Panel, warrant the conclusion that, as the Hearing Panel found, Bogoraz's testimony was "so lacking in coherence and consistency as to be wholly unworthy of belief." As the Panel observed, his testimony "on its face [was] insufficient to support a finding of additional payments or a finding that the payments made for narrative reports were, in fact, at least in part, referral fees." The evidence offered by the Committee documenting respondent's payments to the Medical Arts Center establishes only that she paid

the prevailing market rate for its narrative reports, which were necessary for effective representation of the referred clients.

We reject the Committee's contention that an aggravating factor is established by respondent's simultaneously representing drivers and passengers in automobile collision cases. Respondent acknowledged that on a number of occasions over the years she had represented both drivers and passengers in the same accident, but explained that she only did so after (1) ascertaining that there was no viable cross claim for negligence on the driver's part and that therefore the clients' interests were not adverse, (2) orally advising the clients of the nature of the potential conflict and the benefits and disadvantages of dual representation, and (3) having them sign a waiver form. Given the Hearing Panel's finding that respondent was credible, which we perceive no basis to dispute, we accept this assertion. It is the Committee's position that nevertheless the conflict created by such a situation is nonwaivable under *Pessoni v Rabkin* (220 AD2d 732 [1995]), and that in any event the waiver forms respondent used were insufficient. However, *Pessoni* concerned an attorney who "clearly anticipated that a cross claim would be interposed" against his driver client, but nevertheless also undertook to represent the driver's passenger (*id.* at 732). It does not stand for as broad a proposition as that suggested by the Committee. Neither *Pessoni* nor the then-applicable DR 5-105 (a), categorically preclude the possibility of a proper waiver where there is no viable cross claim against the driver. Nor does *LaRusso v Katz* (30 AD3d 240 [2006]) support the Committee's position; there, too, the attorneys "were aware of the potential conflict" and yet failed to advise the clients of the conflict (*id.* at 244).

As to the Committee's contention that the conflict waiver form that respondent had her clients sign was insufficient to avoid a violation of DR 5-105, no particular waiver form was required under the Disciplinary Rule at the time, and there was no requirement that such a form recite the full contents of counsel's oral explanation regarding potential conflicts.

However, although we adopt the findings of the Hearing Panel, in our view, the undisputed misconduct for which respondent was convicted, her use of an agent to solicit a potential client who has already explicitly declined a referral to counsel, warrants a suspension rather than the censure proposed by the Hearing Panel.

Respondent's misconduct is more egregious than that considered in *Meyerson* or *Rudgayzer*, in which the attorneys entered into essentially implicit agreements with a medical provider to make payments which, while ostensibly for narrative reports, were at least partially in exchange for continued patient referrals. This matter is more analogous to those cases in which attorneys have knowingly and purposefully entered into explicit arrangements in which they paid third parties in exchange for referrals of injured potential clients; in such cases, suspensions have often resulted in those instances where the attorney was experienced enough to know better. In *Matter of Ehrlich* (252 AD2d 73 [1998]), the attorney made cash payments to a hospital employee for referrals of over 30 patients during a two-year period, and a three-month suspension was imposed. In *Matter of Santalone* (301 AD2d 265 [2002]), this Court imposed a three-month suspension where the respondent was only shown to have engaged in one incident in which he paid a fee to a third party for referring a personal injury client. Suspension, rather than censure, was warranted because the acts constituted knowing and willful misconduct by attorneys who understood the impropriety.

Violating Judiciary Law §§ 479 and 482, by directing a non-attorney employee to attempt to wrest a retainer out of a clinic patient who had already specifically declined an attorney referral, is equally serious to arranging for an agent to refer presumably interested and willing clients. Consequently, it warrants a similar sanction. We conclude that a three-month suspension is appropriate here.

Accordingly, the Committee's motion is granted in part, insofar as it seeks to disaffirm the Hearing Panel's recommendation of the penalty of censure; instead, we impose a suspension for a period of three months. Respondent's cross motion is denied.

GONZALEZ, P.J., MAZZARELLI, SAXE, FRIEDMAN and CATTERSON, JJ., concur.

Respondent suspended from the practice of law in the State of New York for three months, effective April 7, 2011, and until further order of this Court.